IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LISA PHELAN                                                              PLAINTIFF

V.                                          NO. 15-5195

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security Administration          DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Lisa Phelan, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under the provisions of Titles II and XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff filed her applications for DIB and SSI on July 25, 2012, alleging disability beginning March 7, 2010, due to Chiari Malformation, Ehlers-Danlos Syndrome, cervical degenerative disc disease, cervical radiculopathy, neuropathy, subacromial bursitis, insomnia and fatigue, temporomandibular joint dysfunction ("TMJ"), tinnitus, pressure headaches, blurry vision, muscle weakness, and muscle spasms. (TR. 49, 286, 304). An administrative hearing was held on August 26, 2013, at which Plaintiff appeared with counsel and testified. (TR. 65-97).

By written decision dated March 28, 2014, the Administrative Law Judge ("ALJ") found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe – Chiari I Malformation,[1] Ehlers-Danlos Syndrome,[2] and cervical degenerative disc disease. (TR. 51-54). After reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (TR. 54). The ALJ determined Plaintiff retained the residual functional capacity ("RFC") to:

> perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a).

---

[1] A Chiari I Malformation is a Type I Chiari Malformation where the lowest part of the cerebellum extends into the hole at the base of the skull through which the spinal cord passes. The National Institute of Neurological Disorders and Stroke states that individuals with a Chiari Malformation may complain of numerous symptoms such as: "neck pain, balance problems, muscle weakness, numbness or other abnormal feelings in the arms or legs, dizziness, vision problems, difficulty swallowing, ringing or buzzing in the ears, hearing loss, vomiting, insomnia, depression, or headache made worse by coughing or straining." Medication may treat some symptoms but surgery is the only method to treat the underlying problem and danger. Posterior fossa decompression surgery relieves pressure on the spinal column by "making an incision at the back of the head and removing a small portion of the bottom of the skull." Alternatively, a spinal laminectomy procedure, involves the surgical removal of part of the arched, bony roof of the spinal canal (the lamina) to increase the size of the spinal canal and relieve pressure on the spinal cord and nerve roots." *NIH Publication No. 13-4839: Chiari Malformation Fact Sheet*, National Institute of Neurological Disorders and Stroke (Published June 2013), https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Chiari-Malformation-Fact-Sheet

[2] Multiple types of Ehlers-Danlos Syndrome exist and while the record does not specify which type Plaintiff suffered from, the record contains multiple references to the hypermobility of Plaintiff's joints. Hypermobility type Ehlers-Danlos Syndrome is characterized by excessively loose joints. The Gale Encyclopedia of Medicine states, "Both large joints, such as the elbows and knees, and small joints such as toes and fingers, are affected. Partial and total joint dislocations are common. . . . Many individuals experience chronic limb and joint pain, although x rays of these joints appear normal. The skin may also bruise easily. . . . EDS hypermobility type is inherited in an autosomal dominant manner." 3 Java O. Solis, *Ehlers-Danlos Syndrome, in* THE GALE ENCYCLOPEDIA OF MEDICINE 1674-1678 (Jacqueline L. Longe ed., 5th ed. 2015).

(TR. 54-58). With the help of the vocational expert ("VE"), the ALJ determined that during the relevant time period, Plaintiff would be able to perform her past relevant work as an insurance clerk for a medical facility, a secretary, a collections clerk, and an admissions clerk. (TR. 58).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied her request on July 1, 2015. (TR. 1). The Appeals Council examined additional evidence dated after the date of the ALJ's decision and determined the new information submitted by Plaintiff was about a time after the relevant period, and that Plaintiff would have to submit a new application for consideration of the new evidence. (TR. 2). Subsequently, Plaintiff filed this action. (ECF No. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (ECF Nos. 10, 11).

## II.    Evidence Presented:

The record contains voluminous evidence concerning the period prior to the relevant period. Although Plaintiff initially alleged an onset date of March 7, 2010, Plaintiff was previously granted a closed period of disability from March 5, 2010, through April 24, 2011, in another proceeding. (TR. 49) (ECF No. 10, p. 2). Therefore, the relevant period in this case is April 25, 2011, the date the Commissioner previously determined medical improvement occurred, to March 28, 2014, the date of the ALJ's decision.

Plaintiff met with Dr. Simon Farrow on April 25, 2011, for a consultative examination. (TR. 510-18). Dr. Farrow completed a Medical Source Statement with RFC. Dr. Farrow essentially determined Plaintiff retained the RFC to perform work at the light exertion level. Id. Dr. Farrow, however, described Plaintiff's behavior during the examination as "dramatic" and stated that Plaintiff made what he described as "a noncooperation decision about peripheral

3

neurological examination." Id. Dr. Farrow, moreover, stated, "[Plaintiff] did not cooperate meaningfully with attempts to assess fine hands control, rapid repetitive and rapid alternating movements, etc." Id.

Plaintiff complained of joint instability in her hip and pelvis on April 28, 2011, to Dr. Ben Robinson. (TR. 902-04, 1203-06). Dr. Robinson noted, "she does have apparent hemiparesis of the left extremity with some apparent weakness and disuse." Id. Dr. Robinson examined x-rays of Plaintiff's pelvis and left hip and prescribed physical therapy for hip girdle strengthening, and he noted that an intra-articular left hip injection may be necessary in the future. Id.

Dr. Spencer Miller examined Plaintiff on May 3, 2011, and attempted to conduct an EMG study, which was unsuccessful because, "the patient was unable to tolerate the pain associated with the study, and therefore the study was abandoned without any diagnostic information gleaned." (TR. 892-97). Dr. Miller diagnosed Plaintiff with a Chiari I Malformation post-surgical decompression, left hemiparesis, peripheral neuropathy, gait instability, joint laxity, left hip girdle laxity, relative B12 deficiency, and potential hyperglycemia or pre-diabetes. Id. Dr. Miller recommended B-complex vitamins and Alpha Lipoic Acid and Borage Oil supplements in addition to an increase in Plaintiff's Neurontin. Id. He also recommended Plaintiff continue physical therapy and emphasized free-style swimming for twenty minutes at least three times per week. Id.

Plaintiff visited Dr. Syed Ahmad on May 24, 2011, for a referral for genetic counseling and complained of right upper quadrant pain. (TR. 634, 889-91). An ultrasound of Plaintiff's abdomen showed prior gall bladder surgery and needed further correlation with lab data to determine whether or not Plaintiff had a lesion or stone. Id.

On June 17, 2011, Plaintiff visited Dr. Ahmad to complete an examination for his Medical Source Statement and RFC Assessment. (TR. 521-27, 875-77). Clinic notes from the visit indicate Dr. Ahmad spent forty-five minutes of face-to-face time with Plaintiff and indicate that Dr. Ahmad's physical findings were all normal. Id. Dr. Ahmad's Medical Source Statement and RFC Assessment, however, indicated that Plaintiff was incapable of performing any tasks at even the sedentary exertion level. Id. When prompted by the documentation for explanation, Dr. Ahmad regularly cited Plaintiff's own subjective complaints of pain and fatigue. Id.

Plaintiff visited Dr. Cyclopea Anakwa on July 1, 2011, for a follow-up appointment and complained of abdominal and rib pain. (TR. 869-71). Dr. Anakwa noted some abnormalities during the physical portion of the examination, particularly with regard to decreased sensation on Plaintiff's left side, coordination problems, and an abnormal gait and stance with left sided weakness. Id. Dr. Anakwa adjusted Plaintiff's medication and ordered further imaging which was conducted on July 5, 2011. (TR. 636). Imaging was inconclusive without clinical correlation. Id.

On July 8, 2011, Plaintiff met with Dr. Michael Blair regarding her blurry vision and was diagnosed with dry eye syndrome in both eyes, a condition for which Plaintiff eventually received plug-type implants in her eyes. (TR. 865-66, 1200-02). Of particular note during Dr. Blair's July 8, 2011, exam was that Plaintiff noted no other problems or pain. Id.

On July 11, 2011, Plaintiff saw Dr. Mary Willis as part of a consultation to have some paperwork completed for her disability claim. (TR. 859-64, 1195-99). Dr. Willis noted that Plaintiff did not appear well and was uncomfortable in any position other than laying supine on the exam table, that the small joints of Plaintiff's fingers were hyperextensible, and that

Plaintiff was experiencing pain with range of motion of her shoulders. Id. The record is unclear on whether or not Dr. Willis completed the paperwork Plaintiff presented to her.

Plaintiff complained of dark urine, pelvic cramping, and cramps in her right calf to Dr. Anakwa on July 19, 2011. (TR. 633, 854-57, 1115, 1157-58). Dr. Anakwa's physical examination of Plaintiff revealed normal movement of all of Plaintiff's extremities, no sensory abnormalities, and normal coordination, balance, gait, and stance. Id.

Plaintiff saw Dr. Miller again on August 9, 2011, for a follow-up appointment. (TR. 845-48). Dr. Miller noted that Plaintiff had an abnormal gait, wide base, hyperextension of her left knee and postured her left hip to avoid pain when she stepped. Id. He also noted a peripheral neuropathy. Id. Among medication and vitamin supplements, Dr. Miller wanted Plaintiff to continue with self-rehabilitation by swimming at least three times per week for twenty minutes each time and to perform stretches three times per day. Id.

On August 10, 2011, Plaintiff visited Dr. Ahmad for him to fill out more paperwork with regard to Plaintiff's disability claim. (TR. 842-44). Dr. Ahmad noted abnormal movement in Plaintiff's extremities and reduced motor strength. Id. The record does not contain a Medical Source Statement or RFC Assessment from Dr. Ahmad for this date. On October 3, 2011, however, Dr. Ahmad wrote a letter to Plaintiff's disability attorney at the time, Mr. Scott Davis, and stated, "Since my practice does not specialize in disability evaluation, it would be best suited that she be seen and evaluated by a Disability Physician." (TR. 815-16).

On August 11, 2011, one day after meeting with Dr. Ahmad, who noted Plaintiff exhibited abnormal movement in her extremities and reduced motor strength, Plaintiff visited with Dr. Anakwa, who conducted a motor exam which demonstrated no dysfunction. (TR.

838-41). Dr. Anakwa did note Plaintiff had an abnormal gait with a wide base and hyperextension of her left knee. Id.

Plaintiff saw Dr. Manuchehr Darani on September 16, 2011, for right upper quadrant and lower abdominal pain. (TR. 817-26, 1185-94). Dr. Darani's objective physical exam revealed no abnormalities except for tenderness in Plaintiff's right upper quadrant. Id. Dr. Darani suspected Plaintiff may have been suffering from sclerosing cholangitis and referred her to a gastrointestinal specialist for further evaluation. Id.

On October 11, 2011, Plaintiff complained to Dr. Ahmad of gasping during her sleep and excessive tiredness during the day. (TR. 811-13). Dr. Ahmad's objective physical exam revealed only normal findings. Id. Dr. Ahmad's clinic notes indicate that Plaintiff was not eligible to receive financial assistance for care outside of the military facility and that Plaintiff elected to forgo a sleep study at a local facility until she received disability insurance to assist with the cost. Id.

Plaintiff followed up with Dr. Miller on October 13, 2011, regarding her abnormal gait. (TR. 632-33, 805-10). Dr. Miller noted decreased response to pain and temperature stimulation on Plaintiff's right and left knee and medial leg, and that she limped with an apractic gait. Id. Imaging of Plaintiff's lumbar spine, left hip and pelvis were normal. Id. An MRI of Plaintiff's brain dated the same day showed stable post-operative changes compatible with her previous Chiari decompression surgery and capacious CSF space around the posterior cerebellar tonsils and inferior cerebellum. Id. Dr. Miller referred Plaintiff to the orthopedic clinic for re-evaluation of her left hip hypermodality during her gait. Id.

Plaintiff saw Dr. Jonathan Ricker on October 18, 2011, concerning her chronic right upper quadrant pain. (TR. 632, 799-803). An abdominal ultrasound showed Plaintiff's prior

gallbladder surgery but was inconclusive with regard to a lesion or stone without correlation with laboratory data. Id. An MRI of Plaintiff's pancreatic ducts were also inconclusive with regard to sclerosing cholangitis without further correlation. Id. Plaintiff was released without limitations. Id.

Plaintiff visited with Dr. Joseph Stuart in November of 2011, concerning her left hip pain and instability, but the record is unclear on whether her appointment took place on the first or the thirteenth of the month. (TR. 792-94, 1181-84, 1407-10). Dr. Stuart noted Plaintiff's forward flexion was to one hundred twenty degrees without pain, but that Plaintiff did have pain with impingement testing and that she had some gross weakness on that side. Id. Dr. Miller specifically declined to recommend surgical intervention and recommended Plaintiff perform exercises to stretch and strengthen her hip and her core. Id.

On December 19, 2011, Plaintiff met with Dr. Frederick Snyder regarding a Tailor's Bunion on her right foot. (TR. 621-32, 768-72, 1105, 1176-80, 1374-79). Dr. Snyder prescribed orthotics and counseled Plaintiff. Id. Plaintiff never acquired the orthotics because of the cost and Dr. Snyder eventually recommended a Tailor's bunionectomy on January 30, 2012, due to continued pain in Plaintiff's right foot. (TR. 748-52, 1333, 1348-53).

On January 5, 2012, Plaintiff saw Dr. Ahmad regarding pain in her left hand after she fell the previous week. (TR. 631, 757-60, 1103, 1154, 1360-65). Dr. Ahmad's objective physical exam was normal and x-rays of Plaintiff's left hand showed no abnormalities. Id. On January 19, 2012, however, Plaintiff saw Dr. Charlotte Shealy regarding pain in her right arm and shoulder. (TR. 630-31, 753-56, 1099, 1101, 1153-54, 1354-59). Dr. Shealy's objective physical exam revealed a down sloping right shoulder, pain when Plaintiff reached her right hand to her left shoulder and overhead, and tenderness to palpation of the acromioclavicular

joint of Plaintiff's right shoulder. Id. X-rays of Plaintiff's right shoulder were normal and Dr. Shealy recommended continuing her current pain medication and wearing a shoulder sling. Id. Plaintiff saw Dr. Ahmad on February 6, 2012, concerning her continued shoulder pain. (TR. 745-47, 1344-47). Dr. Ahmad recommended continuing her pain medication and use of her arm sling, and referred Plaintiff to an orthopedist for further evaluation. Id. Dr. Ahmad released Plaintiff with no limitations. Id.

On February 15, 2012, Dr. Snyder agreed to perform a modified chevron Tailor's bunionectomy on Plaintiff's right foot on February 17, 2012. (TR. 629, 1095, 1152, 733, 1330-35).

Plaintiff visited Kevin Eckersley, a physician's assistant, on February 23, 2012, regarding her bilateral shoulder pain, pain and weakness in her arms, and peripheral neuropathy in both her upper and lower extremities. (TR. 727-31, 1171-73, 1321-23). The record indicates Plaintiff underwent extensive imaging tests on February 23, 2012. (TR. 626-29, 1087, 1089, 1091, 1093, 1148-52, 1324-28). An MRI of Plaintiff's Cervical Spine revealed the following:

C2/C3 demonstrates no evidence of significant disc herniation, central canal stenosis, or neural foraminal narrowing.

C3/C4 demonstrates minimal broad-based disc noted without evidence of central canal stenosis, there is neural foraminal narrowing bilaterally.

C4/C5 demonstrates minimal broad-based disc bulging without evidence of significant central canal stenosis. There is mild relative right-sided neural foraminal narrowing.

C5/C6 demonstrates mild broad-based disc bulge and disc degeneration. There is mild narrowing of the AP diameter of the central canal to approximately 9mm. There is mild bilateral neural foraminal narrowing.

C6/C7 demonstrates no evidence of significant disc herniation, central canal stenosis, or neural foraminal narrowing.

C7/T1 demonstrates no evidence of significant disc herniation or central canal
stenosis. There is mild neural foraminal narrowing bilaterally.

. . .

Mild multilevel cervical disc disease, most significantly at C5/C6. . .

. . .

Id. at 627. Five views of Plaintiff's cervical spine showed bilateral upper extremity radiculopathy and multilevel spondylosis of the cervical spine, primarily at C5/C6 with mild bilateral neural foraminal narrowing. Id. Imaging of Plaintiff's lumbar spine, right shoulder, and left shoulder, were all unremarkable. Id. Plaintiff also saw Dr. Snyder for post-surgical follow up regarding her Tailor's bunionectomy procedure. (TR. 724-26, 1317-20). Plaintiff continued regular follow-up appointments with Dr. Snyder, who regularly noted that Plaintiff was healing well, and he recommended that she limit walking as much as possible, but to eventually increase her activity level gradually. (TR. 608-1-, 685-91, 707-13, 721-26, 1266-70, 1291-301, 1313-16).

Plaintiff followed-up with Kevin Eckersley on April 9, 2012. (TR. 707-10, 1291-97). Eckersley's objective physical exam revealed the following:

The bilateral upper extremities are NVI without lesions or LAD. Normal gait. Bilat. The shoulder musculature is symmetric with no winging of the scapula. ROM is symmetric and somewhat limited secondary to pain and generalized weakness. The shoulders are globally tender to palpation. There is a negative supraspinatus, drop arm, subscapularis lift off, speeds, Yergason's, Neer's, Hawkins, crossarm, modified O'Brien's, apprehension, Jobe's relocation, sulcus. There is increased anterior and posterior translation of the glenohumeral joint. She has significant Spurling's.

Id. Eckersley diagnosed Plaintiff with cervical radiculopathy based on his examination and a review of the previous MRI and x-rays. Id. The clinic notes also indicate they discussed Chiari symptoms and he recommended she follow up with a neurologist and, "A recommendation to

her beyond that would be to see pain management for evaluation and considerations of a cervical epidural." Id.

On April 19, 2012, Plaintiff visited with Dr. Murray Kemp regarding her dizziness. (TR. 699-702, 1280-84). Plaintiff reported "wooziness" when rapidly changing from a supine to a standing position. Id. Dr. Kemp noted that Plaintiff's coordination in her left upper extremity was reduced but that her strength was symmetric and a Romberg's test was negative. Id. Dr. Kemp referred Plaintiff to neurology for further examination. Id. An MRI of Plaintiff's brain dated April 25, 2012, was normal with stable post-operation changes due to her Chiari decompression surgery. (TR. 626, 1148, 1252).

Plaintiff followed-up with Dr. Miller on May 16, 2012, with regard to radiating neck pain, chest tightness, and low back pain. (TR. 611-14, 1260-65). Plaintiff stated that she had not been able to achieve any significant lasting relief from her current treatment regimen. Id. Dr. Miller stated, "she is not exercising at present for conditioning. She is stretching, but notes difficulty with most types of exercise due to shoulder pain/neck pain/'shoulder misalignment,' etc." Id. Dr. Miller recommended Plaintiff eat a well-rounded diet, sleep more, and to have a daily bowel movement. Id. Dr. Miller also recommended swimming every other day and building up to free-style swimming for at least twenty to thirty minutes with stretching before and after. Id. Dr. Miller further noted, "to tone the muscles and strengthen the joints (shoulders, hips, knees, ankles), you will note less laxity and tremendous reduction in pain." Id. Dr. Miller also discussed the return of Plaintiff's headaches, and noted the following:

> She is taking Percocet every 4-6 hours to relieve return of headaches. Headaches are all posterior with radiation into the occipital nerve regions. This is causing her headaches. Majority of her headache is rebound. I will not make changes at this time to the meds, as her body is not ready for the additional adjustment. Once she is toned, I can begin the process.

11

. . .

After toning the neck muscles with swimming/stretch – I will begin the process of headache control with multi-modal approach including occipital nerve blocks (alternating Marcaine and Marcaine/steroids), weaning Percocet, and optimizing long-term pain meds with frequent follow up.

. . .

The patient was counseled on analgesic rebound headache meaning, causes (prescribed and over-the-counter analgesic chronic or frequent usage), and treatment options (discontinuation of offending agent(s), need for treatment of breakthrough headaches while awaiting the rebound period to subside). The patient was asked to research this condition online as well to understand the process and determine what risk factors/offending agents can be avoided.

Id. The record does not appear to contain the records of any further follow-up appointments with Dr. Miller.

On June 7, 2012, Plaintiff visited Dr. Benjamin Dudley with complaints of recurring urinary tract infection and incomplete bladder emptying. (TR. 615-17, 682-84, 1168-70, 1256-59). Dr. Dudley conducted an objective physical examination and noted Plaintiff had appropriate movement and strength in her extremities as well as normal gait and coordination. Id. Plaintiff visited Dr. Donielle Freedman on June 19, 2012, with regard to left arm pain continuing for the previous six months. (TR. 618-22, 677-81, 1249-52). Dr. Freedman noted in her physical findings that Plaintiff exhibited normal movement of all of her extremities and no muscle weakness, but that her motor strength was reduced. Id.

Plaintiff visited the Northwest Arkansas Free Health Center on September 12, 2012. (TR. 1766-68, 1805-06). The records of this visit are handwritten and difficult to read. The record appears to indicate Plaintiff was diagnosed with gastroesophageal reflux disease for which she was recommended an over-the-counter treatment, and polyneuropathy for which she was prescribed Neurontin. Id. The record contains a third diagnosis, which is difficult to

discern from the handwritten record but may have been nausea, because Plaintiff was prescribed Zofran for treatment. Id. The healthcare provider also tested the flexion of Plaintiff's hips and lower extremities, which all appear to have been rated as two out of five, with a notation that others were two to three out of five. Id. The record also indicates that Plaintiff appeared angry when told that she would not be able to have controlled substances prescribed through the clinic. Id. at 1768, 1806.

On September 18, 2012, Plaintiff saw Dr. Barbara Ashe at Washington Regional Medical Center after having fallen on her back onto a tile floor. (TR. 1772-82). Dr. Ashe's physical examination revealed normal range of motion in Plaintiff's neck, back, and upper extremities, but with tenderness. Id. Dr. Ashe also noted that Plaintiff's motor strength was normal, her sensation was intact, her radial pulse was normal, that she had full range of motion in her lower extremities, and that her neurological examination was normal. Id. A CT of Plaintiff's cervical spine showed no acute fracture or subluxation, but did show degenerative disc disease which was most severe at the C5-C6 level. Id. CTs of Plaintiff's lumbar and thoracic spine were both normal. Id. Dr. Ashe diagnosed Plaintiff with low back pain as well as thoracic back pain and cervical degenerative disease and prescribed Flexeril, Percocet, and Zofran. Id.

Plaintiff met with Dr. Terry Efird, Ph.D. on October 25, 2012, for a consultative mental examination. (TR. 1786-90). Dr. Efird diagnosed Plaintiff on Axis I with major depressive disorder, moderate, and anxiety disorder not otherwise specified, based on Plaintiff's own subjective reports and endorsements. Id. Dr. Efird ruled out a diagnosis of cognitive disorder not otherwise specified, and assigned Plaintiff a GAF score range of 50-60. Id. Dr. Efird noted Plaintiff endorsed the ability to engage in the following activities: drive unfamiliar routes with

13

the assistance of a GPS device, shop independently with a motorized cart, manage personal finances, interact with her brother and daughter, and sometimes attend church. Id. He noted Plaintiff had some difficulty on the task of serial threes but otherwise had no difficulty communicating in a reasonably intelligible, effective, and socially adequate manner, and that she tracked and responded adequately. Id. He also indicated Plaintiff had the mental capacity to persist with tasks, although Plaintiff's mental pace of performance was slow, and that that she could perform basic work like tasks within a reasonable period. Id.

Dr. Dan Gardner, a non-examining State agency consultant, reviewed Plaintiff's claims at the initial consideration level on October 25, 2012. (TR. 112-15, 132-35). Dr. Gardner opined Plaintiff retained the RFC to perform light work with only occasional stooping and crouching. Id. Dr. Kay Gale, a non-examining State agency consultant, reviewed Plaintiff's claims at the initial consideration level on October 30, 2012. (TR. 115-16, 135-36). Dr. Gale opined Plaintiff could only engage in unskilled work, that she retained the "ability to perform simple, routine, repetitive tasks in setting where interpersonal contact is incidental to work performed; supervision required is simple, direct and concrete." Id. at 116, 136.

Dr. Charles Friedman, a non-examining State agency consultant, reviewed Plaintiff's claims at the reconsideration level on February 4, 2013. (TR. 156-58, 177-79). Dr. Friedman opined Plaintiff retained the RFC to perform light work with only occasional stooping and crouching. Id. Dr. Winston Brown, a non-examining State agency consultant, reviewed Plaintiff's claims at the reconsideration level on February 5, 2013. (TR. 158-60, 179-81). Dr. Brown opined Plaintiff could only engage in unskilled work, that she retained the "ability to perform simple, routine, repetitive tasks in setting where interpersonal contact is incidental to work performed; supervision required is simple, direct and concrete." Id. at 160, 181.

14

Plaintiff returned to the Northwest Arkansas Free Health Center on April 23, 2013. (TR. 1803-04). The records of this visit are handwritten and difficult to read, but indicate Plaintiff appeared uncomfortable and that she had some muscle tenderness with no guarding. Id. The record appears to indicate Plaintiff was diagnosed with neuropathy and nausea. Id. The clinic refilled Plaintiff's Neurontin, but it is unclear what the clinic prescribed for nausea. Id. The record also contains a general wellness reference with regard to a potential future mammogram and colonoscopy. Id.

Plaintiff again presented to the Northwest Arkansas Free Health Center on June 5, 2013. (TR. 1801-02). The records of this visit are handwritten and difficult to read, but indicate Plaintiff again appeared uncomfortable, as well as irritable. Id. Plaintiff was diagnosed with neuropathy and was prescribed a new medication, which cannot be discerned from the handwritten record. Id. Plaintiff was also diagnosed with nausea/dysphagia and was prescribed Zofran and scheduled to undergo an esophagogastroduodenoscopy ("EGD"). Id. The record also indicated a third diagnosis which cannot be discerned from the handwritten record, but it does appear this diagnosis was related to post-menopause and that an over-the-counter treatment was recommended. Id.

Plaintiff underwent an EGD with dilation on July 10, 2013, at Washington Regional Medical Center. (TR. 1807-09). Plaintiff's preoperative diagnosis was dysphagia and postoperative diagnosis was distal esophageal stricture status post dilation with 52-French Maloney. Id. The EGD was otherwise unremarkable except for some erythema in the bulb, which Dr. John Moore noted was consistent with minor non erosive duodenitis. Id. A biopsy was collected during the procedure, and the final diagnosis was of a "body mucosa with no histopathologic abnormality." Id. at 1809.

Plaintiff submitted additional medical evidence to the Appeals Council after the ALJ issued his decision on March 28, 2014, which is summarized below.

An MRI of Plaintiff's cervical spine was conducted on January 31, 2014, which appears to show some further degenerative changes of Plaintiff's cervical spine, but while the record does list the findings of the MRI, it does not contain an impression or interpretation correlated with Plaintiff's complaints and diagnoses. (TR. 32-33). An x-ray of Plaintiff's lumbar spine on February 18, 2014, showed mild facet degenerative changes at the L5-S1 level, but was otherwise normal. (TR. 31). An MRI of Plaintiff's lumbar spine on April 30, 2014 showed a small right paracentral annular tear and protrusion at the T12-L1 level as well as mild narrowing of the right lateral recess. (TR. 29-30). There was also a small left paracentral annular tear with a generalized annular disc bulge at the L5-S-1 level. Id. The record indicates mild hypertrophy with minimal foraminal narrowing, as well as mild degenerative disc disease at the L3-L4 and L4-L5 levels. Id.

On May 1, 2014, Plaintiff visited Dr. Anthony Capocelli in what appears to be an appointment to establish care. (TR. 18-20). Dr. Capocelli's objective physical examination showed significant point tenderness in Plaintiff's mid-cervical spine and decreased range of motion in multiple planes, as well as a poor gait despite good range of motion in her lower back. Id. Dr. Capocelli also noted Plaintiff had a gaze nystagmus. Id. Dr. Capocelli planned to treat Plaintiff's neck pain with epidural steroid injections and follow through traction. Id. He noted, however, that he wanted to review a new MRI of Plaintiff's head and a CINE flow before going forward with any new treatment. Id. On May 12, 2014, MRI's were conducted on Plaintiff's brain and thoracic spine which showed a significant flow obstruction and cerebellar slumping, as well as right paracentral disc herniation at T12-L1 and a small left disc

16

herniation at T10-T11. (TR 27-28). Plaintiff followed-up with Dr. Capocelli on June 27, 2014, who recommended "re-exploration with duraplasty tonsillar resection and cranioplasty," and Plaintiff agreed to proceed with the treatment. (TR. 17). The procedure was conducted on August 6, 2014, and the record states, "Postoperatively the patient has progressed as expected and is able to ambulate greater than 300 feet without difficulty, has had a bowel movement and pain is controlled on oral meds." (TR. 16, 21-26). Plaintiff was subsequently discharged to her home in good condition with instructions to abstain from strenuous activity for six weeks.  Id.

Clinic notes from Dr. Madhu Kalyan, on January 28, 2015, indicate Plaintiff was referred for a sleep consultation due to fatigue. (Tr. 10-14). Dr. Kalyan did not note any abnormal findings during an objective physical examination. Id. An overnight sleep study was planned but the records of the study, if one was conducted, are not a part of the record. Id.

## III.    Applicable Law:

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. Teague v. Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the

17

record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. Id.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); See also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if she reaches the final stage does the fact finder consider Plaintiff's age, education, and work experience in light of her residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

18

**IV.      Discussion:**

Plaintiff argues in this appeal that: 1) the Appeals Council failed in its duty to consider new and material evidence timely submitted by Plaintiff which pertained to the period prior to the ALJ's adverse decision; 2) and, the ALJ did not base his determination of Plaintiff's RFC on all of the relevant evidence in the record. (ECF No. 10).

**A.      Additional Medical Evidence:**

Reviewing courts have the authority to order the Commissioner to consider additional evidence but "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); Woolf v. Shalala, 3 F.3d 1210 (8th Cir. 1993); Chandler v. Secretary of Health and Human Servs., 722 F.2d 369, 371 (8th Cir. 1983). "To be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination." Woolf, 3 F.3d at 1215. Thus, to qualify as "material," the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition.  See Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997) (holding immaterial evidence detailing a single incident occurring after decision and noting proper remedy for post-ALJ deterioration is a new application).

This Court, having examined the record as a whole, and having compared the additional medical evidence with the other evidence in the record, finds that the additional medical evidence is not probative of Plaintiff's condition for the relevant period for which benefits were denied, and that there is not a reasonable likelihood that it would have changed the Commissioner's determination. The additional medical evidence demonstrates post-decision

deterioration of Plaintiff's pre-existing condition, which the ALJ properly considered when he determined Plaintiff's Chiari I Malformation, Ehlers-Danlos Syndrome, and cervical degenerative disc disease were severe impairments and again when he incorporated all of Plaintiff's impairments into the RFC. The additional medical evidence, therefore, is immaterial, and the Commissioner did not commit error in refusing to consider it.

**B.      Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 946, 966 (8th Cir. 2003). The ALJ's credibility determination is entitled to deference if the ALJ provides good reasons and the determination is supported by substantial evidence. See Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012); Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) ("If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment." quoting Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006)).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. The ALJ

discussed Plaintiff's access to her prescribed medications and her testimony with regard to her own pain and limitations. (TR. 54-55). The ALJ also discussed all of the relevant medical evidence in the record and noted that while Plaintiff suffered with some limitation, many times the objective medical evidence showed her condition was stable or improving. For example, the ALJ discussed the treatment notes of Dr. Miller who opined that Plaintiff's headaches during the relevant period, "regardless of the initial cause . . . [were] mainly analgesic rebound headache[s]," and that instead of placing limitations on Plaintiff's activity, Dr. Miller wanted Plaintiff to swim every other day and stretch her muscles to tone her body so he could better adjust her medication for her headaches. (TR. 57). The ALJ also considered Plaintiff's activities of daily living and noted the following:

> she had some problems with per personal care due to dizziness and pain. She further reported that she prepared her own meals daily, that she did some household chores, i.e., small loads of laundry, washed dishes and swept once a week, that she grocery shopped using an electric cart once or twice a month and that she drove short distances when she felt up to it. [Plaintiff] reported to Dr. Efird that she drove unfamiliar routes with a GPS, and she endorsed the ability to shop independently most of the time while using a motorized car and to handle her personal finances adequately. [Plaintiff] testified that she prepares meals, i.e., cereal, sandwiches and frozen foods, that she drives short distances when she feels well and that she changes her own linens.
>
> . . .
>
> [Plaintiff] testified that she feels disoriented or lost, that her son makes the major decisions and pays all of the bills and that she would not be able to keep it straight. However, she also reported in Exhibit 4E that she read when able, usually while lying down, and she testified that she belongs to a book club, that they meet once a month and that she has been to a few of the meetings but cannot always go every month.

(TR. 52-53). The record also indicates and the ALJ discussed that Plaintiff was uncooperative with at least one of her consultative examiners, Dr. Farrow. (TR. 56). The ALJ stated:

> He reported that [Plaintiff] made a 'noncooperation decision' about her peripheral neurological examination and that there was no clear focal weakness,

> that her muscle tone was normal and that her deep tendon reflexes (DTR's) were normal. He reported that she did not cooperate meaningfully with attempts to assess fine hands control, rapid, repetitive and rapid alternating movements, etc., and that by general observation during the course of the interview and examination and from the pattern of her deliberately uncooperative performance, he formed the impression that there were no significant abnormalities of fine hand control or other arm or hand control.

(TR. 56). Despite the ALJ's findings, he gave Plaintiff's subjective complaints considerable weight in limiting her RFC determination to that of work at the sedentary exertion level, and determined she had greater physical limitations than those assessed by Dr. Farrow after "giving [her] every benefit of the doubt." (TR. 58). The ALJ did not entirely disregard all of Plaintiff's subjective complaints, but the inability to work without some pain or discomfort is not a sufficient reason to find a Plaintiff disabled within the strict definition of the Act. The issue is not the existence of pain, but whether the pain Plaintiff experiences precludes the performance of substantial gainful activity. See Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, she has not established that she is unable to engage in any gainful activity. Accordingly, the Court concludes that the ALJ provided good reasons for discounting Plaintiff's subjective complaints and that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not entirely credible.

## C.     ALJ's RFC Determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545, 416.945. It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from

22

symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id. The disability claimant has the burden of establishing her RFC. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010).

The Commissioner will generally give a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)" "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2)3; see also Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005). Yet such weight is neither inherent nor automatic and does not "obviate the need to evaluate the record as whole," Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). As we have frequently noted, "treating physician opinions may receive limited weight if they are conclusory or inconsistent with the record." Julin v. Colvin, 826 F.3d 1082, 1088 (8th Cir. 2016). The Commissioner "'may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012) (quoting Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010)); accord Hacker, 459

23

F.3d at 937 (noting we have declined "to give controlling weight to the treating physician's opinion because the treating physician's notes were inconsistent with her . . . assessment").

Plaintiff specifically contends the ALJ's RFC determination was not based on substantial evidence because he improperly discounted the opinion of Dr. Syed Ahmad. (ECF No. 10, pp. 6-9). With regard to the opinion of Dr. Ahmad, the ALJ stated the following:

> Dr. Ahmad completed a medical source statement on June 17, 2011, which is incorporated herein by reference as if set forth in full (Exhibit 14F). However, the undersigned gives this opinion little or no weight as it is more restrictive than the findings of record would support. Further, his opinion is in conflict with the other evidence of record, and it appears that he completed this form based, at least in part, on the claimant's reported abilities as she testified that she and her doctor discussed her limitations.

(TR. 58). Dr. Ahmad was Plaintiff's primary treating physician during the relevant period and completed his Medical Source Statement and RFC Assessment on June 17, 2011. (TR. 521-27, 875-77). The ALJ gave some weight to the opinion of Dr. Simon Farrow, a consultative examiner who examined Plaintiff on April 25, 2011, and who also completed a Medical Source Statement and RFC Assessment. (TR. 510-18). The ALJ did not, however, give controlling weight to Dr. Farrow's opinion, as Dr. Farrow determined Plaintiff retained the RFC to perform work at the light exertion level, and the ALJ stated, "in giving [Plaintiff] every benefit of the doubt, the undersigned finds that she has greater physical limitations than those Dr. Farrow assessed." (TR. 58).

Of particular note is the objective examination of Plaintiff conducted by Dr. Ahmad on June 17, 2011, the date which Dr. Ahmad completed his assessment. The record indicates that on June 17, 2011, Dr. Ahmad spent forty-five minutes of face-to-face time with Plaintiff to complete the forms she presented to him. (TR. 877). The clinic notes from that visit detail Dr. Ahmad's objective physical examination of Plaintiff. (TR. 876-77). The notes indicate Dr. Ahmad's physical findings with regard to Plaintiff's vital signs, general appearance, neck,

lymph nodes, lungs, cardiovascular system, abdomen, and musculoskeletal and neurological systems were all normal. Id. In particular, the clinic notes indicate Plaintiff exhibited normal movement in all her extremities, had no muscle tenderness, no sensory abnormalities, no coordination abnormalities, and a normal balance, gait, stance, and reflexes. Id. Despite the physical findings described in the clinic notes, on Plaintiff's disability paperwork Dr. Ahmad opined Plaintiff was unable to perform any activity at even the sedentary level, and heavily cited Plaintiff's subjective complaints of pain as the basis of his opinion. (TR. 521-27). The ALJ's cited inconsistency between Dr. Ahmad's opinion and other evidence in the record from the same day is alone sufficient to discount Dr. Ahmad's opinion. See Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005) ("While the ALJ also found Dr. Prihoda's opinion to be internally inconsistent, we need not comment on that, as an appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion").

This Court has also examined the ALJ's findings with regard to the mental portion of Plaintiff's RFC. The ALJ declined to incorporate any mental limitations into Plaintiff's RFC despite the non-examining State agency consultants' opinions Plaintiff was limited to unskilled work. (TR. 58). They based their opinions primarily on the diagnoses of Dr. Efird who diagnosed Plaintiff with major depressive disorder and anxiety disorder based on Plaintiff's own subjective statements and endorsements. (TR. 98-183). The ALJ gave little weight to the mental RFC findings of the non-examining State agency consultants because their determinations were inconsistent with the other evidence of record, which the ALJ addressed when he discussed the opinion of Dr. Efird. (TR. 58). With regard to Dr. Efird's opinion, the ALJ noted, "there is no evidence the claimant was referred for mental health treatment or that she was prescribed psychotropic medications and, in fact, the record shows that she denied

mental symptoms/impairments on several occasions." (TR. 52). Plaintiff, moreover, did not allege disability due to a mental health impairment in either her application or at the hearing. The ALJ determined Plaintiff did not have a severe mental impairment, and that any mental limitation from which Plaintiff may have suffered did not further limit Plaintiff's RFC in combination with her other medically determinable impairments. (TR. 52, 54-58).

The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of many treating physicians, surgeons, and specialists, as well as those of the non-examining state agency consultants, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole). Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination for the relevant time period.

**V.      Conclusion:**

Accordingly, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of January, 2017.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE